An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-375

Filed 3 December 2025

Chowan County, Nos. 21JT000002-200, 21JT000003-200, 21JT000017-200

IN THE MATTER OF:
I.H., A.H., R.H.

Appeal by Respondent from orders entered 13 September 2024 and 25–26 November 2024 by Judge Amber Davis in Chowan County District Court. Heard in the Court of Appeals 28 October 2025.

> *Hornthal, Riley, Ellis & Maland LLP, by Lauren Arizaga-Womble and Zachary M. Robeson, for Petitioner–Appellee Chowan County Department of Social Services.*
>
> *Parker Poe Adams & Bernstein LLP, by Cassie R. Zietlow and Stephen V. Carey, for Appellee Guardian ad Litem.*
>
> *Attorney Jason Senges, for Respondent-Appellant Mother.*

MURRY, Judge.

Respondent Cassandra Holcomb (Mother) appeals the trial court's amended permanency–planning orders, filed 13 September 2024, and its subsequent orders terminating her parental rights to her minor children, I.H. (Irene), A.H. (Arthur), and R.H. (Ruth).[1] For the reasons below, this Court affirms the trial court's termination

---

[1] In accordance with North Carolina Rule of Appellate Procedure 42(b), we refer to the minor children by pseudonyms to protect their identities. *See* N.C. R. App. P. 42(b).

of Mother's parental rights.

## I.   Background

On 3 June 2021, the Chowan County Department of Social Services (DSS) filed juvenile petitions alleging that Irene and Arthur were neglected and dependent as defined by N.C.G.S. § 7B-101(9), (15). DSS documented the family's prior history with child protective services, which included allegations of Mother's neglect and abuse of Irene and Arthur's older half-siblings. That same day, the trial court granted DSS nonsecure custody of Irene and Arthur.  One week later, the trial court appointed counsel for Mother.

DSS then requested child medical evaluations for Irene, Arthur, and their older half-siblings, which concluded that the half-siblings were victims of "intrafamilial child torture[,] which included severe physical abuse, sexual abuse, . . . emotional/psychological abuse, neglect, and deprivation." On 24 August 2021, Mother gave birth to Ruth.  One day later, DSS filed a juvenile petition alleging that Ruth was neglected and dependent as defined by N.C.G.S. § 7B-101(9), (15). That same day, the trial court granted DSS temporary custody of Ruth.

In January and March 2022, the trial court held two disposition hearings, in which a forensic psychologist testified to her administration of a parenting-capacity evaluation to Mother as requested by DSS. The psychologist reported that Mother "did not meet DSM-5 criteria for a mental health, personality, or substance use disorder," and that "[h]er difficulties [we]re behavioral in nature" only. The trial court

adopted in its findings the psychologist's recommendation of long-term intensive therapy for Mother. On 2 March 2022, the trial court entered a disposition order containing these findings, ordering a permanent plan for the children of reunification with a concurrent plan of guardianship, and scheduling a permanency–planning review hearing on 12 May 2022.

On 14 April 2022, the trial court reviewed a "status update" from DSS of "eligible therapeutic providers" for Mother. The trial court found that Mother had made an "untruthful" report to DSS of the unavailability of all approved providers. Following that hearing, the trial court ordered Mother to "engage in intensive therapeutic treatment as recommended by" her parenting capacity evaluator "with an approved provider." After a permanency–planning review hearing on 14 July 2022, the trial court found Mother's continued noncompliance and ordered her again to "follow [the] recommendations set forth in her parenting capacity evaluation" regarding therapy.

On 25 August 2022, Mother emailed her court-appointed attorney that he was "not authorized to represent [her] in any way" and was "fired" as of that day. On 8 September 2022, the trial court held another hearing, during which Mother's counsel moved to withdraw based in part on this email. The trial court engaged in a colloquy with Mother regarding her desire to terminate her attorney's representation and informed her of the consequences of doing so:

THE COURT: You need to understand that your court-appointed

attorney is a wonderful attorney who protects his client's rights. But you're indicating you do not want him to represent you.

MOTHER: Yes, your Honor.

. . . .

THE COURT: He is your court-appointed attorney. If you fire him, there will be no other court-appointed attorney representing you in this matter. You can always retain whatever counsel you want. You can represent yourself. But you will not be afforded another court-appointed attorney.

MOTHER: Yes, your Honor, I am sui juris.

THE COURT: By saying that, let me make sure I understand. You are representing yourself. You are not asking for a court-appointed attorney at this time?

MOTHER: Correct.

(Quotation modified.) The trial court allowed the withdrawal.

Following the attorney's withdrawal, Mother moved for the trial judge to recuse herself, which was denied, and then she called a witness to testify. On cross-examination, Mother's witness affirmed her "aware[ness] of the facts that led to the removal of the children from [Mother]" because she had "knocked on [Mother's] door and asked . . . [to] read her papers." Because the "hearing on [Mother's] motions" left "no court time remaining for a hearing on Permanency Planning," the trial court continued the permanency–planning hearing to 19 October 2022.

On 19 October 2022, the trial court confirmed that Mother was "still 100 percent content with proceeding on [he]r own in this matter without [he]r court-appointed attorney." Immediately after this colloquy, Mother claimed she could "not

- 4 -

. . . proceed" because she "ha[d] not been able to obtain [her] entire case file." The trial court noted that Mother had already had the "opportunity to review virtually everything" in the case file with her then-appointed attorney. Despite this, the trial court asked Mother's former court-appointed attorney, functioning as standby counsel, to provide Mother with copies of the case file.

The trial court also noted Mother's past conduct suggesting that she had publicized confidential case-related information on her social media. Photographs admitted into evidence showed a social media post in which Mother invited others to join her at case hearings for "support" because she was "battling these giants without an attorney." The trial court documented Mother's creation of other social media content "about her DSS case, including blaming [the children's half-brother] for her children being removed," and found that Mother "continue[d] to post on . . . Facebook[ ] about this matter."

Due to these confidentiality-related concerns, the trial court required Mother to review the documents at the court clerk's office with a law-enforcement officer present. The trial court also issued a protective order over the release of the children's confidential forensic interviews to Mother. The trial court then continued the hearing until the next day to give Mother time to review the documents. The following day, after a partial hearing, the trial court continued the permanency–planning hearing to 21 November 2022. At the 21 November 2022 hearing, Mother represented herself with standby counsel present. Mother objected multiple times to the DSS supervisor's

testimony and to the DSS attorney's introduction of her social media posts into evidence. She then unsuccessfully moved to vacate an unspecified "judgment" of the trial court.

Mother testified on her own behalf. She alleged that the DSS supervisor "misrepresent[ed]" her children's medical histories and claimed to possess "medical records" and "therapy records" to disprove these alleged misrepresentations. Mother then proffered a document she called an "express trust." She testified that she was the "found living heir of the express trust" and "disclaim[ed]" any role as a "fiduciary or a surety for any commercial liability." That same day, the trial court entered a permanency–planning order changing the children's permanent plan to adoption with a concurrent plan of guardianship.[2] The order found in relevant part that Mother fired her court-appointed counsel as of 25 August 2022 via email and that he "was permitted to withdraw as counsel of record on that date."

Mother continued to represent herself at a subsequent hearing and filed multiple pleadings, motions, and letters to the trial court *pro se*. Following another review hearing on 21 September 2023, the trial court entered a permanency–planning

---

[2] Although the trial court's order is dated 21 November 2022, it was not filed until 11 January 2024. **{R pp 344, 327}** In the order, the trial court concludes as a matter of law that "[t]he best plan of care to achieve a safe, permanent home for [Arthur, Irene, and Ruth] . . . is a primary plan of adoption with a concurrent plan of guardianship." **{R p 343}** However, the decretal portion of the order mistakenly states the children's permanent plan as "reunification with a concurrent plan of adoption." **{R p 344}** Filed on 13 September 2024, the trial court's amended order corrects the decretal portion of the 21 November 2022 order to state the children's permanent plan as "adoption with a concurrent plan of guardianship." **{R pp 464, 481}**

order in which the children's permanent plan remained adoption with a concurrent plan of guardianship.[3] **{R p 387}**

On 19 January 2024, DSS filed petitions to terminate Mother's parental rights to all three children based on Mother's neglect, willfully leaving the children in foster care for over twelve months, and abandonment. *See* N.C.G.S. § 7B-1111(a)(1) (neglect); *id.* § 7B-1111(a)(2) (willful leaving); *id.* § 7B-1111(a)(7) (abandonment).

The trial court held the adjudication hearing over four separate dates between 22 April and 12 September 2024, all of which Mother attended with her court-appointed counsel. On 13 September 2024, the trial court amended the permanency–planning order dated 21 November 2022 (First Amended Order) and the permanency–planning order dated 21 September 2023 (Second Amended Order). That same That same day, Mother filed a notice to preserve her right to appeal from both amended orders under N.C.G.S. § 7B-1001(a)(5) and (8).

The trial court entered an adjudication order on 25 November 2024 concluding that grounds existed for termination of Mother's parental rights under N.C.G.S. § 7B-1111 (a)(1)–(2). Based on testimony from DSS, the guardian *ad litem* (GAL), and therapeutic service providers, the trial court found that Mother "made insufficient

---

[3] Although the trial court's order is dated 21 September 2023, it was not filed until 12 January 2024. **{R pp 396, 387}** In the order, the trial court concludes as a matter of law that "[t]he best plan of care to achieve a safe, permanent home for [Arthur, Irene, and Ruth] . . . is a primary plan of adoption with a concurrent plan of guardianship." **{R p 395}** However, the decretal portion of the order mistakenly states the children's permanent plan as "reunification with a concurrent plan of adoption." **{R p 396}** On 13 September 2024, the trial court amended the 21 September 2023 order, correcting it to state the children's permanent plan as "adoption with a concurrent plan of guardianship." **{R pp 482, 491}**

progress" to "work towards reunification" by "fail[ing] to fully engage" with either DSS or therapy. Based on the "unchanged" conditions that led to the children's removal three years prior, the trial court found a "strong probability of repetition of neglect and abuse if the children were returned to [Mother's] care." The trial court entered a disposition order the following day terminating Mother's parental rights to Irene, Arthur, and Ruth. Mother filed notice of appeal to this Court on 10 December 2024 from the First Amended Order, the Second Amended Order, and both termination orders.

## II. Jurisdiction

Under N.C.G.S. § 7B-1001, this Court has jurisdiction to hear Mother's appeal of the termination orders because her appeal concerns "order[s] that terminate [her] parental rights." N.C.G.S. § 7B-1001(a)(7) (2025). This Court also has jurisdiction to hear Mother's appeal of the amended permanency–planning orders because they "eliminat[ed] reunification . . . as a permanent plan" for the children. *Id.* at § 7B-1001(a)(5).

## III. Analysis

On appeal, Mother asks this Court to vacate the First Amended Order, the Second Amended Order, and the subsequent orders terminating her parental rights. Mother contends that the trial court erred (1) by accepting her waiver of counsel without ensuring that the waiver was knowing and voluntary, and (2) by failing to conduct a competency inquiry and appoint a parental GAL for her under North

Carolina Rule of Civil Procedure 17.

We review *de novo* a trial court's determination of whether a parent properly waived the statutory right to counsel in a juvenile proceeding. *See In re K.M.W.*, 376 N.C. 195, 209 (2020); N.C.G.S. § 7B-602. However, we review the trial court's ultimate decision to allow that waiver only for an abuse of discretion. *See In re J.R.*, 250 N.C. App. 195, 201 (2016). We also review a trial court's decision regarding a parental competency inquiry and the appointment of a parental GAL solely for abuse of discretion. *See In re T.L.H.*, 368 N.C. 101, 107 (2015). Based on these considerations, this Court holds that the trial court (1) did not err by accepting Mother's waiver of counsel, and (2) did not abuse its discretion by choosing neither to conduct a competency inquiry nor appoint a parental GAL. Thus, this Court affirms the trial court's termination of Mother's parental rights.

## A. Waiver of Counsel

Mother claims that the trial court erred by permitting her to proceed *pro se* "without a knowing and voluntary waiver of counsel." Specifically, Mother argues that the trial court erred: (1) by accepting her initial waiver of counsel despite her "lack[ of] . . . ability to make a knowing and voluntary waiver"; (2) by allowing her to proceed *pro se* at the 21 November 2022 hearing without "meaningful conversation" about her previous waiver; (3) by "depriv[ing her] of counsel"; (4) by violating her attorney–client privilege with "improper[ ] question[s]" of her court-appointed standby counsel; and (5) by failing to make findings of fact in the First Amended

Order that her waiver of counsel was knowing and voluntary. For the following reasons, we disagree on all counts.

### 1. *Knowing and Voluntary Waiver*

Mother challenges her waiver of counsel by suggesting that her interaction with the trial court and the "non-sensical statements" in her 25 August 2022 email gave the trial court "ample reason . . . to know" that her "waiver of counsel was not knowing." We disagree. Because an indigent "parent has the right . . . to appointed counsel" in a juvenile abuse, neglect, and dependency case, N.C.G.S. § 7B-602(a), the trial court may only allow the parent "to proceed without the assistance of counsel" after "examin[ing her] . . . and mak[ing] findings of fact sufficient to show that the waiver is knowing and voluntary." *Id.* § 7B-602(a1).

Here, the trial court properly inquired regarding Mother's desire to waive counsel and explained to Mother on multiple occasions her right to court-appointed counsel and the responsibilities of self-representation. Mother affirmed that she understood her rights and desired to proceed without an attorney. Certain unusual email statements notwithstanding, Mother repeatedly conveyed her desire to terminate her counsel's representation. Her subsequent conduct at the hearing does not show a lack of ability to understand the consequences of her waiver. *See A.Y.*, 225 N.C. App. at 39 (affirming trial court's acceptance of waiver despite the respondent's emotional and personality-related "difficulties" because she showed awareness of waiver's consequences). Mother interrogated a witness on the stand immediately

after the trial court accepted her waiver. When the DSS attorney cross-examined that same witness, Mother objected for relevance. And for nearly a year afterwards, Mother filed pleadings, motions, and letters to the trial court *pro se*. The trial court's thorough explanation and repeated inquiries ensured that the waiver was knowing and voluntary, while Mother's interaction with the trial court showed a lucid understanding of the proceedings. Thus, this Court holds that the trial court did not err by allowing Mother to waive counsel.

### 2. *Continuing Self-Representation*

Mother next asserts that, even assuming the validity of her initial waiver, the trial court erred by failing to renew the waiver colloquy at the 19 October 2022 hearing. We disagree. A valid waiver of counsel lasts either until "the proceedings . . . terminat[e]" or the waiving party informs the trial court of her "desire[ ] to withdraw the waiver." *State v. Hyatt*, 132 N.C. App. 697, 700 (1999). A trial court need not repeat the waiver inquiry under N.C.G.S. § 7B-602 as long it determines that the parent's initial waiver was "knowing and voluntary." *See* N.C.G.S. § 7B-602(a1) (2025). Here, at the 8 September 2022 hearing, the trial court properly inquired about Mother's knowing and voluntary waiver of counsel. The trial court then confirmed her initial waiver and her desire to proceed *pro se* at the 19 October 2022 hearing. In March 2023, Mother filed a handwritten document reiterating her desire to proceed without counsel. Because the trial court exceeded the statutory requirement by confirming Mother's initial waiver at a subsequent hearing, this Court holds that the

trial court did not err by allowing Mother to waive counsel.

### 3. *"Deprivation-of-Counsel" Claim*

Mother also contends that the trial court essentially "depriv[ed her] of counsel" because it did not "treat [her] equally as an attorney." Specifically, Mother claims the trial court forbade her from receiving copies of certain "forensic interviews" and instead "forced [her] to review [those] documents at the clerk's office while "watched by law enforcement," "thereby restricting her time to prepare" for the hearing. We disagree.

Mother stated that she was "not ready to proceed" at the 19 October 2022 hearing because she did not "obtain [her] entire case file." The trial court noted that Mother had already had the "opportunity to review virtually everything" in the case file with her court-appointed attorney but nevertheless continued the hearing to give her time to review the case file once more. The trial court required Mother to review the children's forensic interviews at the clerk's office, accompanied by a law–enforcement officer, to protect the confidentiality of these sensitive documents. Considering prior witness testimony that Mother had inappropriately shared confidential case documents, the trial court took appropriate measures to ensure that Mother would keep the children's forensic interviews confidential. *See In re K.T.L.*, 177 N.C. App. 365 (2006) (confidentiality of juvenile proceedings is within the trial court's discretion). Thus, this Court dismisses Mother's argument as meritless.

### 4. *Court-Appointed Attorney's Disclosures*

Mother contends that, at the 19 October 2022 hearing, the trial court "improperly questioned" her standby counsel about his "interactions" with her, and that his answers violated attorney–client privilege. Although attorney–client privilege protects "all confidential communications made by the client to his attorney," *Dickson v. Rucho*, 366 N.C. 332, 340 (2013) (quotation omitted), Mother's standby counsel remarked generally about his possession of her case file. Because he did not disclose the content of any communications between himself and Mother, attorney–client privilege does not apply. Thus, we dismiss this argument also as meritless.

### 5. *Waiver*

Mother further claims that the trial court erred by failing to make findings in the First Amended Order that her waiver of counsel was knowing and voluntary. "A parent qualifying for appointed counsel may be permitted to proceed without the assistance of counsel only after the court examines the parent and makes findings of fact sufficient to show that the waiver is knowing and voluntary." N.C.G.S. § 7B-602 (a1). "The court's examination shall be reported as provided in [N.C.G.S. § ]7B-806." *Id.* Under N.C.G.S. § 7B-806, "All adjudicatory and dispositional hearings shall be recorded by stenographic notes or by electronic or mechanical means. Records shall be reduced to a written transcript only when timely notice of appeal has been given." *Id.* § 7B-806.

Here, the trial court's First Amended Order finds that Mother requested that her counsel withdraw and that Mother's counsel was permitted to do so. Furthermore, the transcript of the 8 September 2022 hearing documents the trial court's thorough inquiry into Mother's waiver of counsel and demonstrates that Mother's waiver of counsel was knowing and voluntary. Although the trial court could have made more detailed findings, the record clearly indicates that Mother's waiver was knowing and voluntary. Mother does not argue that the trial court's inquiry into her decision to proceed *pro se* was deficient or that the trial court prejudiced her by its order. Furthermore, any deficiency in the First Amended Order is not prejudicial, particularly in light of the fact that Mother's parental rights were correctly terminated.

## B. Competency Inquiry

Second, Mother argues that the trial court erred by failing to conduct a parental competency inquiry and appoint a parental GAL under North Carolina Rule of Civil Procedure 17 during the 21 November 2022 hearing. For the following reasons, we disagree. For juvenile abuse, neglect, and dependency cases, a trial court "may appoint a [GAL] . . . for a parent who is incompetent in accordance with [Rule 17]." N.C.G.S. § 7B-602(c) (2025). Rule 17 requires GAL representation of an "incompetent" defendant and authorizes a trial court to appoint a GAL for an incompetent defendant who has no known legal guardian. N.C. R. Civ. P. 17(b)(2). An "incompetent adult" is one "who lacks capacity to manage . . . [her] own affairs or to

make or communicate important decisions" regarding her "person, family, or property." N.C.G.S. § 35A-1107.

The trial court must "properly inquire into" a civil litigant's "competency . . . when circumstances are brought to the judge's attention [that] raise a substantial question as to whether the litigant is *non compos mentis*." *In re Q.B.*, 375 N.C. 826, 831 (2020) (quotation omitted). The trial court has "substantial deference" in this decision because it "actually interacts with the litigant whose competence is . . . in question" and can "better . . . assess[ ] . . . [her] mental condition than [can] an appellate court." *Id.* at 108. As a result, "when the record contains an appreciable amount of evidence tending to show that the litigant . . . is not incompetent," this Court "should not, except in the most extreme instances," hold that a trial court "abused its discretion by failing to inquire into that litigant's competence." *Id.* at 108–09.

Despite her irrelevant statements on "express trust[s]" and "commercial liability," Mother competently engaged with the trial court and opposing counsel. She moved to vacate the trial court's judgment and argued that she had evidence to disprove a witness's alleged "misrepresentations of facts." Mother remained coherent and responsive throughout the hearing, evidenced by her =multiple objections to statements made by opposing counsel. Furthermore, the termination petition does not allege parental incompetence, basing termination grounds only on Mother's neglect, willfully leaving the children in foster care for over twelve months, and

- 15 -

abandonment. *See* N.C.G.S. § 7B-1111(a)(1)–(2), (7). And Mother's parenting capacity evaluation concluded that she "d[id] not meet DSM-5 criteria for a mental[-]health . . . disorder" but that "[h]er difficulties [we]re behavioral in nature and [we]re not due to mental[-]health pathology."

Mother represented herself at multiple hearings throughout this proceeding prior to the 21 November 2022 hearing. Having ample opportunity to observe Mother's behavior, the trial court reasonably exercised its discretion not to conduct a competency inquiry based on Mother's lucid interactions and active participation in the proceedings. *See Q.B.*, 375 N.C. at 834. This record "tend[s] to show that [Mother] was . . . [ ]competent," thus "obviat[ing] the necessity for . . . a competence inquiry." *T.L.H.*, 368 N.C. at 109. Thus, this Court holds that the trial court did not abuse its discretion by declining to inquire about Mother's competence or to appoint her a parental GAL.

## IV. <u>Conclusion</u>

For the reasons discussed above, this Court affirms (1) the trial court's acceptance of Mother's waiver of counsel and (2) the trial court's discretionary decisions neither to conduct a competency inquiry of Mother nor appoint a parental GAL for her. Thus, this Court affirms the termination of Mother's parental rights.

AFFIRMED.

Judges COLLINS and FLOOD _____.

Report per Rule 30(e).